UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARK FITCH,<br><br>                Plaintiff,<br><br>v.<br><br>WARDEN RANDY BLADES; SGT. SEGADELLI; CPL. SELTZER; SHANNON CLUNEY; KENNETH BENNETT; DR. YOUNG; DR. AGLER; CORIZON MEDICAL; and IDAHO DEPARTMENT OF CORRECTION,<br><br>                Defendants. | Case No. 1:15-cv-00162-BLW-CWD<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Before the Court is the motion for summary judgment filed on June 8, 2016, by Defendants Drs. Young and Agler. (Dkt. 29.) Plaintiff was notified of the summary judgment rule requirements, yet failed to file a response to Defendants' motion. On July 18, 2016, Plaintiff filed a motion to for voluntary dismissal of the claims were allowed to proceed against Defendants Segadelli and Stelzer. (Dkt. 33.) The Court granted Plaintiff's motion on September 7, 2016. The Court's order left only Plaintiff's Eighth Amendment

MEMORANDUM DECISION AND ORDER - 1

claim against Defendants Young and Agler for their alleged complete failure to treat Plaintiff's hepatitis-C.[1]

Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. The motion will be decided on the record before this Court without oral argument. Dist. Idaho L. Rule 7.1(d). The Court issues the following report considering the merits of Defendants' motion, and recommends that it be granted and the complaint against Defendants dismissed with prejudice for the reasons discussed below.

## FACTS

Because Plaintiff failed to file an appropriate opposition in the form of citations to the record, or affidavits rebutting Defendants' assertions of fact, the Court considers the facts set forth by Defendants undisputed for purposes of the motion. Fed. R. Civ. P. 56(c)(2). The facts most critical to an understanding of the issues follow.

Plaintiff alleges Drs. Agler and Young violated his Eighth Amendment rights because Defendants refused him Hepatitis C ("HCV") treatment; as a result, he claims his life will be shortened, while his lifestyle deteriorates, and he is allowed to die. (Compl. Dkt. 1 at 14.) Plaintiff seeks compensatory, general, and punitive damages, as well as an injunction to start HCV treatment immediately. (*Id.* at 18.)

---

[1] The Court addressed the claims asserted against all named Defendants in its initial review order. (Dkt. 6.) The Court allowed Plaintiff to proceed against Defendants Segadelli and Stelzer on Plaintiff's claims of retaliation under the First Amendment, and against Defendants Young and Agler on Plaintiff's claims of deliberate indifference under the Eighth Amendment. The Court did not allow Plaintiff to proceed on his claims asserted against any of the other Defendants named in the complaint, and Plaintiff did not file an amended complaint.

**MEMORANDUM DECISION AND ORDER - 2**

Hepatitis C is an infection caused by a virus that attacks the liver, leading to inflammation. Most individuals do not experience symptoms from HCV until long after the initial infection when liver damage is identified through blood work. (Agler Aff. ¶ 4.)

Plaintiff has HCV, genotype 1b. Agler Aff. ¶ 8. (Dkt. 3); (Dkt. 29-5 at 3.) Other relevant medical history includes a diagnosis for schizoaffective disorder, alcohol dependence, and a cerebral vascular accident ("CVA") and myocardial infarction resulting in left sided weakness and fusion of the right thumb. (Dkt. 29-5 at 6.) Medical providers started Plaintiff on a course of the triple drug therapy of PEG-interferon, Ribavirin, and Boceprivir or Telaprevir, on May 1, 2013. Young Aff. ¶9; Agler Aff. ¶¶ 9-12. (Dkt. 29-5 at 35; 29-6 at 29-30; 29-7 at 19-20.) At that time, Plaintiff had stage 3 liver fibrosis, but no cirrhosis. (Dkt. 29-5 at 1-3.)

By August 9, 2013, the health care providers stopped the triple drug therapy due to side-effects. Agler Aff. ¶ 10; (Dkt. 29-7 at 14-17.) Plaintiff's viral load was initially undetectable post-treatment, but by November 19, 2013, Dr. Agler noted the HCV had returned. Agler Aff. ¶¶ 11, 13; (Dkt. 29-8 at 7, 11.) The treatment had failed. (*Id.* ¶ 13.) Patients who have failed a prior course of HCV treatment are more likely to fail later courses of treatment. Young Aff. ¶ 10.

Post treatment, Plaintiff remained in the chronic care clinic ("Chronic Care") for HCV. Agler Aff. ¶ 12. On November 25, 2013, Dr. Agler evaluated Plaintiff as part of Chronic Care. He determined Plaintiff's HCV was in fair control and stable. He ordered lab work with follow up in three months. Agler Aff. ¶ 13; (Dkt. 29-7 at 6-9.)

**MEMORANDUM DECISION AND ORDER - 3**

On February 20, 2014, PA Eastman evaluated Plaintiff in Chronic Care. He ordered CBC and CMP tests and scheduled Plaintiff for follow up in three months. Agler Aff. ¶ 14; (Dkt. 29-7 at 5.)

Dr. Dawson evaluated Plaintiff for hand pain on April 30, 2014. (Dkt. 29-6 at 24.) Dr. Dawson noted that Plaintiff was possibly at Stage 4 HCV; he had a history of substance abuse; and he received a recent DOR for a positive urinalysis test for amphetamines and methamphetamines. Dr. Dawson noted no visible evidence of hand pain on examination and Plaintiff had been fully functional for the last six months on ibuprofen alone. Dr. Dawson was concerned with NSAID usage in light of liver disease and discontinued Mobic and Excedrin. She offered adjunct pain medication such as Tegretol or valproic acid to Plaintiff for hand pain, but he wanted to think about it. (Dkt. 29-6 at 24.) On May 1, 2014, Dr. Dawson started Plaintiff on Tylenol and ordered further blood work. Agler Aff. ¶ 17; (Dkt. 29-5 at 27.)

On May 16, 2014, PA Matt Valley saw Plaintiff in HCV Chronic Care. Agler Aff. ¶ 18; (Dkt. 29-7 at 4.) Valley noted Plaintiff's CVA was thought to have been drug induced and it had caused weakness to the right side of his body. Valley planned to monitor the HCV with lab work and examinations, and noted Plaintiff's condition was in good control and stable. Valley scheduled follow up in six months and started Plaintiff on Depakote for pain management. (Dkt. 29-7 at 4.)

On June 18, 2014, Dr. Dawson evaluated Plaintiff and learned Plaintiff was taking ibuprofen from the commissary. (Dkt. 29-6 at 23.) Dr. Dawson had previously discontinued NSAIDs because of Plaintiff's HCV diagnosis. (Dkt. 29-5 at 27.)

**MEMORANDUM DECISION AND ORDER - 4**

According to Dr. Agler, Plaintiff's decision to use NSAIDs in unknown quantities against medical advice made the management of his pain and his HCV more difficult. Agler Aff. ¶ 19. After examining his hand, Dr. Dawson obtained an x-ray which showed mild degenerative joint disease. She ordered Tylenol and offered adjunct pain medication if Plaintiff wanted it. Dr. Dawson also noted to review the commissary records to check on NSAID use and confirmed lab work was scheduled. Agler Aff. ¶ 19; (Dkt. 29-5 at 25; 29-6 at 27.)

On August 28, 2014, Plaintiff requested to try HCV treatment. Agler Aff. ¶ 21; (Dkt. 29-6 at 22; 29-7 at 3.) On October 8, 2014, Dr. Dawson saw Plaintiff to evaluate declining HgB (hemoglobin) and iron levels, indicating microcytic anemia. (Dkt. 29-5 at 23-24; 29-6 at 22.) Plaintiff was pale and reported fatigue. Dr. Dawson could not detect any palpable masses in his abdomen. His liver and spleen were normal. She noted to rule out a lower GI (gastrointestinal) bleed or possible upper GI bleed, but there were no symptoms. She ordered a colonoscopy; repeat bloodwork; a urinalysis; and Hemoccult testing for blood in his stool. She started Plaintiff on Iron 325 mg twice a day for ninety days with follow up after the colonoscopy. (Dkt. 29-5 at 23-24; 29-6 at 22.)

Plaintiff was later transferred to the Idaho State Correctional Center ("ISCC"). There, Dr. Agler evaluated him on October 24, 2014, for left hand pain. (Dkt. 29-6 at 20.) At the time, Plaintiff was not taking anything specifically for pain, although Plaintiff requested Ultram, a narcotic-like medication. Dr. Agler did not consider Ultram appropriate. Dr. Agler discussed also Plaintiff's lab results and the upcoming

**MEMORANDUM DECISION AND ORDER - 5**

colonoscopy and noted to schedule him for HCV Chronic Care. Agler Aff. ¶¶ 1, 24-25; (Dkt. 29-6 at 20.)

On October 30, 2014, Dr. Agler ordered a repeat colonoscopy which he later noted was essentially normal. Agler Aff. ¶ 26; (Dkt. 29-5 at 22.) On November 24, 2014, PA Brown suspected that Plaintiff's advanced HCV caused the anemia. PA Brown noted that Plaintiff already received iron supplements for anemia and that he would be considered for treatment. Agler Aff. ¶ 26; (Dkt. 29-5 at 22; 29-6 at 18-19.) The next day, PA Brown evaluated Plaintiff in HCV Chronic Care. Agler Aff. ¶ 27; (Dkt. 29-6 at 36.)[2] PA Brown noted Plaintiff's APRI was less than 1, a good number, and he did not have jaundice. PA Brown considered the HCV to be in good control and stable. Agler Aff. ¶ 27. PA Brown noted to follow up with Plaintiff in three months. Agler Aff. ¶ 27

On December 16, 2014, PA Brown met with Plaintiff concerning chronic left hand pain. (Dkt. 29-6 at 17.) After discussion of the risks of Tylenol due to HCV and liver damage, PA Brown shifted the patient from Tylenol to Motrin 600 mg three times a day. PA Brown noted that Plaintiff was not an appropriate candidate for Neurontin or Ultram. Agler Aff. ¶ 28; (Dkt. 29-6 at 17.)

On December 20, 2014, PA Smith met with Plaintiff concerning HCV treatment. (Dkt. 29-6 at 16-17.) Smith discussed the new treatment options and how Corizon and IDOC were prioritizing who should receive treatment first. PA Smith noted that a history of failed treatment is a risk factor for new treatment to fail as well, making new treatment

[2] This document is not legible other than the date of November 25, 2014, and the fact PA Brown signed the evaluation.

less feasible. (Dkt. 29-6 at 16-17.) PA Smith advised Plaintiff that his condition would be monitored through regular Chronic Care visits and lab work. Agler Aff. ¶ 29; (Dkt. 29-6 at 16-17.)

A new drug therapy, Harvoni, has been approved by the FDA. Young Aff. ¶ 11. (Dkt. 29-4 at 6.) Although Plaintiff is a candidate for Harvoni, the sickest inmates receive treatment first. The IDOC provides Corizon, LLC, a set fund to treat HCV inmates each year and a complete course of Harvoni for each patient is approximately $96,000.00. Therefore, Dr. Young prioritizes the patients who may receive Harvoni using the Federal Bureau of Prisons Clinical Practice Guidelines, Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection ("Guidelines").

In Dr. Young's opinion, the Guidelines reflect the balancing of limited resources and the need for medical treatment by prioritizing the greatest medical need and the highest likelihood of success for each given patient. (*Id.*) Stable HCV patients may receive lower priority as they are not at an immediate risk of HCV related complications, and current advancements in HCV treatment, which have been tremendous over the last five years, may provide better and more cost efficient treatment options. (*Id.*)

According to Dr. Young, prioritization is based on multiple factors. Young Aff. ¶ 12. (Dkt. 29-4 at 6-7.) First is the status of the HCV infection. Those at a higher metavir stage are prioritized over those patients at a lower stage. Many patients remain stable for years with HCV and can be managed medically. These patients are at a lower priority than patients who have developed cirrhosis or associated comorbidities such as hepatocellular carcinoma or chronic kidney disease. Other health factors include whether

**MEMORANDUM DECISION AND ORDER - 7**

the patient is on a medication that is contraindicated with the HCV treatment or whether the patient is too sick from other conditions to tolerate treatment. These are only a few examples of the many variables that Dr. Young considers when prioritizing a patient for treatment. Providers are expected to exercise their medical judgment to determine whether a patient is appropriate for HCV treatment. *Id.*

Next, Dr. Young explains that providers also consider whether a patient "demonstrate[s] a willingness and an ability to adhere to a rigorous treatment regimen and to abstain from high-risk activities." Young Aff. ¶ 13. (Dkt. 19-4 at 7, citing Ex. B, Guidelines, p. 11). Patients need to successfully complete treatment. As an example, the inmate must be incarcerated within IDOC long enough to receive a full course because the interruption caused by release substantially reduces the likelihood of success. In addition, inmates are evaluated for their propensity to engage in risky behavior while incarcerated, because such behaviors can result in re-infection with HCV. HCV prevalence is higher in the correctional setting. The providers are expected to exercise their medical judgment to determine whether a patient will successfully complete therapy. Young Aff. ¶¶ 11, 13. (Dkt. 19-4 at 6-7.)

On February 4, 2015, Dr. Young met with Plaintiff concerning HCV treatment. Young Aff. ¶ 15; (Dkt. 29-6 at 14-15.) Dr. Young did not consider Plaintiff a good candidate. First, Plaintiff failed previous HCV treatment, which increased the likelihood of future failure. Considering he had reached zero viral load, Dr. Young also suspected Plaintiff became re-infected after the triple drug therapy. Second, it was Dr. Young's opinion that Plaintiff's poor compliance with medication, multiple drug offenses, and his

**MEMORANDUM DECISION AND ORDER - 8**

psychiatric diagnoses indicated that he would not likely complete the twelve week course of Harvoni successfully. (*see* Dkt. 29-12.)

Third, schizoaffective disorder, characterized by abnormal thought processes and deregulated emotions, also indicates poor impulse control and difficulty following rules. Young Aff. ¶ 17. In Dr. Young's opinion, this reduced the likelihood Plaintiff will complete treatment successfully. Young Aff. ¶ 17; (*citing* Ex. B, Dkt. 29-11 at 51, GUIDELINES ("[n]o uncontrolled or unstable medical or mental health conditions.")) Plaintiff's mental health providers have noted he engages in manipulation to obtain medication. (Dkt. 29-9 at 29.)

Plaintiff is being prioritized in the same manner as all other HCV patients. Young Aff. ¶ 17. Dr. Young has not imposed different requirements, conditions, or limitations on Plaintiff. Young Aff. ¶ 17. These requirements are equally applied to other inmates exhibiting the same health needs, concerns, and contraindications for treatment. The inmates who are prioritized ahead of Plaintiff for treatment exhibit more significant HCV related health symptoms and are assessed as more likely to successfully complete treatment. (*Id.*)

On February 18, March 18, and May 2, 2015, PA Smith and PA Brown met with Plaintiff for HCV Chronic Care. Agler Aff. ¶¶ 32, 34-36; (Dkt. 29-5 at 18; 29-6 at 11, 34-35.) PA Brown reviewed treatment options and lab work with Plaintiff concerning HCV. The providers assessed his HCV as stable and in either fair or good control. His clinical status was stable. The providers ordered follow up lab work and tests to continue monitoring Plaintiff's condition.

**MEMORANDUM DECISION AND ORDER - 9**

On August 24, 2015, PA Brown evaluated Plaintiff who appeared chronically ill. (Dkt. 29-6 at 6.) Concerned with his condition, history of HCV, and lab work, PA Brown noted to order a hepatic ultrasound, further lab work, and re-evaluation. Agler Aff. ¶ 40; (Dkt. 29-6 at 6; 29-5 at 11.) Three days later, on August 27, 2015, the lab notified medical staff of abnormal blood results indicating significant anemia. (Dkt. 29-6 at 5.) Dr. Agler had Plaintiff immediately transferred to the infirmary with repeat blood work. After additional abnormal labs, Dr. Agler sent Plaintiff to the hospital via ambulance. (Dkt. 29-5 at 11.) Plaintiff was diagnosed with a chronic duodenal ulcer with hemorrhage. This is what was causing the anemia, not HCV. Agler Aff. ¶ 41; (Dkt. 29-6 at 5.)

Dr. Agler does not currently treat Plaintiff. He did not refer Plaintiff for HCV treatment because Dr. Young had already assessed Plaintiff and listed him for treatment. Agler Aff. ¶ 42. In addition, Plaintiff has remained essentially stable over the last year and a half. Agler Aff. ¶ 42; Young Aff ¶ 18; (Dkt. 29-5 at 23-24; 29-6 at 6, 35-36; 29-7 at 4-5.) His health is not deteriorating due to untreated HCV. If the patient's condition does worsen, Dr. Young will change his priority for treatment. (*Id.*)

## ANALYSIS

1.  **Legal Standards**

    A.  *Summary Judgment*

    Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of

**MEMORANDUM DECISION AND ORDER  - 10**

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The requirement is that there be no genuine dispute as to any material fact. "Material facts are those that may affect the outcome of the case." *See id*. at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c) (3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

**B.**   *Section 1983 Claims*

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Plaintiff must establish the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a

**MEMORANDUM DECISION AND ORDER  - 12**

source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Plaintiff must show that Defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 ... is not satisfied by a showing of mere causation in fact[;][r]ather, the plaintiff must establish proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth Circuit has explained: "A person subjects another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id*. (internal citation omitted).

### C.   *Eighth Amendment Claims of Inadequate Medical Care*

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, Plaintiff must show that he is (or was) "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough

**MEMORANDUM DECISION AND ORDER - 13**

to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). "[D]eliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

**MEMORANDUM DECISION AND ORDER - 14**

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). Deliberate indifference to an inmate's medical needs can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

In the context of medical care, a conclusion that a defendant acted with deliberate indifference requires the plaintiff to show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the

**MEMORANDUM DECISION AND ORDER  - 15**

circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Additionally, mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

**2.    Discussion**

Upon reviewing the evidence of record, and based upon the undisputed facts, the Court finds Plaintiff has been receiving continuous care and treatment for his HCV from both Dr. Young and Dr. Agler. In contrast to Plaintiff's claim that he has not received any care, the facts indicate Plaintiff began in 2013 on a drug therapy, which was initially promising. Once Plaintiff's viral load increased, Plaintiff's condition was managed through the Chronic Care clinic, and he received lab work and an evaluation on a regular basis. The records indicate lab work and evaluations were ordered approximately every three months.

When Harvoni, a newly approved drug therapy, became approved, the record indicates Dr. Young evaluated Plaintiff for such treatment, and in the exercise of his medical judgment, determined Plaintiff was not currently a candidate for such treatment. Dr. Young based his decision upon the fact that Plaintiff's condition at the time was stable. Dr. Young considered also Plaintiff's specific medical condition, drug history, disciplinary history, treatment history, and psychological history when prioritizing his treatment for Harvoni.

Plaintiff does not state a claim for deliberate indifference on these facts, which simply indicate a difference in medical judgment as to the type of treatment Plaintiff should receive. Instead, the medical records indicate Dr. Young made a deliberate, careful judgment about the course of Plaintiff's treatment based upon the severity of Plaintiff's disease, mental health issues, and likelihood of compliance.

As for Dr. Agler, according to the medical records, he was not directly involved in the care and management of Plaintiff's medical condition—Dr. Young was. Dr. Agler has voiced his agreement with Dr. Young's course of treatment. Further, Dr. Agler monitored Plaintiff in the HCV clinic. There is no evidence to suggest Dr. Agler ignored any serious medical need exhibited by Plaintiff. In fact, the evidence suggests otherwise---when Plaintiff developed anemia, Dr. Agler ordered transport to the emergency room for further evaluation.

## CONCLUSION

Plaintiff has failed to satisfy his burden upon summary judgment of showing that the materials in the record establish the presence of a genuine factual dispute. The Court will recommend that Defendants' motion be granted.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)   Defendants' Motion for Summary Judgment (Dkt. 29) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: October 27, 2016

_____
Honorable Candy W. Dale
United States Magistrate Judge